UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

NORTHBROOK NY, LLC,

                                  Plaintiff,                    7:09-CV-0792
                                                             (GTS/TWD)

v.

LEWIS & CLINCH, INC.,

                                  Defendant.
_____

APPEARANCES:                                         OF COUNSEL:

THE CHARTWELL LAW OFFICES, LLP        JOHN M. WUTZ, ESQ.
   Counsel for Plaintiff                          GEOFFREY W. VEITH, ESQ.
1735 Market Street, 29th Floor
Philadelphia, Pennsylvania 19103

OSBORN, REED & BURKE, LLP              JEFFREY M. WILKENS, ESQ.
   Counsel for Defendant
One Exchange Street
Rochester, New York 14614

GLENN T. SUDDABY, United States District Judge

## <u>MEMORANDUM-DECISION and ORDER</u>

        Currently before the Court, in this negligence and breach-of-contract action filed by

Northbrook NY LLC ("Plaintiff") against Lewis & Clinch, Inc. ("Defendant"), is Defendant's

motion for summary judgment.  (Dkt. No. 21.)  For the reasons set forth below, Defendant's

motion is granted in part and denied in part.

I.      **RELEVANT BACKGROUND**

A.      **Plaintiff's Claims**

Plaintiff filed its Complaint in this diversity-jurisdiction action on July 10, 2009.  (Dkt.

No. 1.)  Plaintiff subsequently filed an Amended Complaint on December 7, 2009.  (Dkt. No. 12

[Plf.'s Am. Compl.].)  Generally, Plaintiff's Amended Complaint alleges as follows.

Plaintiff owns and operates a hydroelectric facility located on the Black River in Glen

Park, New York, known as the Glen Park Hydroelectric Project ("the Project").  (*Id*. at ¶ 7.)  The

Project consists of three hydro turbine units, which are identified numerically as units 1, 2, and 3

("Unit 1," "Unit 2," and "Unit 3").  (*Id.* at ¶ 8.)  Each hydro turbine unit is powered by the

controlled flow of river water through the turbine and over the turbine's runner blades.  (*Id.*)

After passing over the runner blades, the water exits through the draft tube into what is called the

"tail race," and returns to the river.  (*Id.*)  Within the tail race exists a draft tube gate that may be

closed to isolate the turbine from the river.  (*Id.*)

The amount of water entering the turbine is controlled by opening, closing, or otherwise

adjusting the size of the opening of the turbine's wicket gates.  (*Id.* at ¶ 9.)  The wicket gates can

be turned to enlarge (open) or reduce (close) the wicket-gate opening through which water may

enter the turbine.  (*Id.*)  The size of the opening of the wicket gates determines the rate at which

the water flows into the turbine.  (*Id.*)

The position of each individual wicket gate is controlled by a mechanism that includes an

actuator arm and a keyless, shaft-hub locking device called a "Ringfeder."  (*Id.* at ¶ 10.)  A

properly tightened Ringfeder connects the actuator arm to the wicket gate shaft in a manner that

allows movement of the actuator arm to turn the wicket gate.  (*Id.* at ¶ 11.)

In addition, a properly tightened (and correctly applied) Ringfeder also acts as a safety device.  (*Id.* at ¶ 12.)  More specifically, should the wicket gate hang up or become obstructed or immobile, the Ringfeder is designed to give or slip to prevent overload, damage, or failure of the mechanism.  (*Id.*)  The wicket gates can be closed on command to prevent any water from flowing into turbine.  (*Id.* at ¶ 13.)

Upon shutdown of a hydro turbine unit, or during a "trip," the wicket gates are commanded to close.  Because this prevents water from entering the turbine, the turbine stops rotating.  (*Id.* at ¶ 14.)  The draft tube gates do not close during normal shutdowns or trips.  (*Id.*)

On January 9, 2008, disturbances on the National Power Grid power lines tripped all three of the Project's hydro turbine units off-line ("the incident").  (*Id.* at ¶ 15.)  Although Units 1 and 3 shut down normally, several wicket gates for Unit 2 failed to close, which allowed water to continue to flow through the turbine.  (*Id.* at ¶ 16.)  The continuous flow of water during the shutdown allowed the turbine to continue rotating, and caused the turbine's speed to dangerously increase.  (*Id.*)  An overspeed protection device within Unit 2 sensed the increasing turbine speed, which signaled the draft tube gate to close in an effort to stop the water and prevent a potentially catastrophic overspeed condition.  (*Id.* at ¶ 17.)  The operation of the overspeed device, as well as the closing of the draft tube gates, ultimately shut down Unit 2.  (*Id.* at ¶ 18.)

The wicket gates that failed to close did so because, although the actuator arms had moved to the "closed" position, the Ringfeders were too loose and slipped.  (*Id.* at ¶ 19.)

Following the incident, while Units 1 and 3 restarted without issue, Unit 2 failed to restart.  (*Id.* at ¶¶ 20-22.)  Unit 2 could not restart until it was dewatered; however, this required the repair of the draft tube gate seals.  (*Id.* at ¶ 23.)  These draft tube gate seals were damaged

when the draft tube gate was forced closed against the excessively high volume and velocity of water flowing through the open wicket gates during the incident. (*Id.*) After new draft tube gate seals were fabricated and installed, Unit 2 was repaired and returned to service on March 3, 2008. (*Id.* at ¶¶ 24-25.)

Approximately four months before the incident (specifically, between September 17, 2007, and September 25, 2007), Defendant performed a variety of mechanical services on Unit 2, including inspecting, cleaning, and adjusting the wicket gates, and removing, replacing, tightening, and adjusting every Ringfeder for each wicket gate. (*Id.* at ¶¶ 26-27.)

The work that Defendant performed on Unit 2 fell below the standard of care that Defendant owed Plaintiff, because Defendant improperly tightened the Ringfeders by leaving them too loose, which ultimately caused, among other things, the damage to the draft tube seals. (*Id.* at ¶¶ 32-36.) In addition, this failure to sufficiently tighten the Ringfeders violated the terms of the parties' contract, which called for the Ringfeders to be tightened and adjusted consistent with the manufacturer's instructions and specifications. (*Id.* at ¶¶ 38, 40.)

Based on all of these factual allegations, Plaintiff asserts two claims against Defendant–one for negligence and the other for breach of contract. (*Id.* at ¶¶ 31-43.) As relief, Plaintiff seeks $895,645.08 in damages, which constitutes $135,959.00 in property damage, and $759,686.08 in lost revenue. (*Id.* at ¶¶ 36, 43.)

### B.    Undisputed Material Facts

Unless stated otherwise, the following facts are undisputed by the parties, based on the current record. (*Compare* Dkt. No. 42 [Def.'s Statement of Material Facts] *and* Dkt. No. 58 [Def.'s Reply to Plf.'s Statements of Additional Material Facts] *with* Dkt. No. 56, Attach. 8

4

[Plf.'s Response to Def.'s Statement of Material Facts and Plf.'s Statements of Additional Material Facts].)

Plaintiff is the corporate owner of Unit 2.  In August 2007, Plaintiff contracted for Defendant, a New York State corporation, to perform certain mechanical maintenance services on the Project through a phone call from Plaintiff's plant supervisor to Defendant's president.

Before entering into this contract, the parties had engaged in similar business transactions, all of which resulted in Defendant sending Plaintiff invoices that included, on the reverse-side of each invoice, General Terms and Conditions ("Terms and Conditions").  The Terms and Conditions were not negotiated between the parties.  The face of the invoice does not indicate that the Terms and Conditions are located on the reverse-side.  Plaintiff denies having any awareness of the existence of the Terms and Conditions before the dispute giving rise to this action arose.

Following completion of its work that is the subject of this litigation, Defendant sent an invoice to Plaintiff.  Plaintiff paid the amount owed according to the invoice.

Defendant did not send Plaintiff any additional information or documentation (other than the invoices that were sent following completion of a job) that referenced or incorporated the Terms and Conditions that Defendant seeks to enforce in its defense of this action.  Defendant also did not provide Plaintiff with "a voluntary choice" of paying an additional premium for the services on a graduated scale, proportional to the risk involved in the services rendered.

Finally, the general purpose of the draft tube gate seals is to prevent backflow of river water into the turbine casing and powerhouse, which allows this area to be made water-tight, pumped-down, and accessed for inspection, maintenance, or repair.

**C.      Parties' Briefings on Defendant's Motion for Summary Judgment**

Generally, in its motion, Defendant argues that the parties' contract precludes Plaintiff

from (1) asserting a claim of negligence and (2) recovering consequential damages on its claim

of breach of contract.  (*See generally* Dkt. No. 43 [Def.'s Memo. of Law].)  More specifically,

Defendant makes the following four arguments.  First, Plaintiff cannot sustain a claim for

negligence, because it has not established a genuine dispute of fact as to whether Defendant

breached a duty to Plaintiff independent of Defendant's obligations arising under the parties'

contract.  (*Id.* at 2-5.)  Second, because Plaintiff, who is a purchaser of services, alleged that it

suffered only economic loss (i.e., direct and consequential damages), Plaintiff is limited to

recovering contractual remedies (and is precluded from recovering tort remedies).  (*Id.* at 5-8.)

Third, Plaintiff's demand for consequential damages is barred by the invoices' Terms and

Conditions.  (*Id.* at 8-14.)  Fourth, even if the Terms and Conditions are unenforceable, Plaintiff

cannot recover consequential damages for lost revenue, because those damages were

unforeseeable at the time the parties contracted.  (*Id.* at 14-15.)

Generally, in response, Plaintiff argues that it may proceed under theories of both tort and

contract, and that the Terms and Conditions are unenforceable.  More specifically, Plaintiff

makes the following three arguments.  First, Plaintiff argues that it passes the threshold

economic-loss test, which determines whether it may recover in both tort and contract under the

circumstances.  (Dkt. No. 56, Attach. 6 at 12-21 [attaching pages "8" through "17" of Plf.'s

Opp'n Memo. of Law].)  Second, Plaintiff argues that there is a genuine dispute of material fact

as to whether the Terms and Conditions are unenforceable for the following two reasons: (1)

Defendant's President, William G. Lewis ("Lewis"), admitted in his deposition that he did not

believe, prior to January 9, 2008, that the Terms and Conditions were enforceable; and (2) Defendant changed its business practices with regard to the Terms and Conditions after it was notified of Plaintiff's claim.  (*Id.* at 21-25.)  Third, Plaintiff argues that public policy and New York General Obligations Law ("NY GOL") § 5-323 render the Terms and Conditions unenforceable.  (*Id.* at 25-29.)

## II.   GOVERNING LEGAL STANDARDS

### A.   Legal Standard Governing Motions for Summary Judgment

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In determining whether a genuine dispute of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  In addition, "[the moving party] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s] the absence of any genuine issue of material fact."  *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986).  However, when the moving party has met this initial responsibility, the nonmoving party must come forward with specific facts showing a genuine dispute of material fact for trial.  Fed. R. Civ. P. 56(a),(c),(e).

A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the novmoving party."  *Anderson*, 477 U.S. at 248.  As a result, '[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact."  *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted].  As the

Supreme Court has famously explained, "[The nonmoving party] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986) (citations omitted).

As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* [citation omitted].

Implied in the above-stated burden-shifting standard is the fact that, where a nonmoving party willfully fails to adequately respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute. For this reason, this Court has often enforced Local Rule 7.1(a)(3) by deeming facts set forth in a moving party's statement to have been admitted where the nonmoving party has willfully failed to properly respond to that statement.[1]

### B.    Legal Standard Governing Diversity Actions

A federal court in a diversity case must look to the choice-of-law rules of the state in which it sits to resolve conflict-of-law issues. *Klaxon Co. v. Stentor Elec. Mfg. Co. Inc.*, 313 U.S. 487, 496 (1941); *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 71-79 (1938); *AroChem Int'l, Inc. v. Buirkle*, 968 F.2d 266, 269-70 (2d Cir. 1992).

Pursuant to New York's choice-of-law rules, to determine the law that governs a contractual relationship between the parties, the Court is to apply the "paramount interest" test,

---

[1]    Among other things, Local Rule 7.1(a)(3) requires that the nonmoving party file a response to the moving party's Statement of Material Facts, which admits or denies each of the moving party's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 7.1(a)(3).

under which the Court must apply the law of the state with the "greatest interest in the litigation." *Tischmann v. ITT/Sheraton Corp.*, 882 F. Supp. 1358, 1366 (S.D.N.Y. 1995) (quoting *Crescent Oil & Shipping Servs., Ltd. v. Phibro Energy, Inc.,* 929 F.2d 49, 52 [2d Cir. 1991]). Generally, in determining which state's interest is paramount, the most significant facts or contacts are those that "relate to the purpose of the particular [substantive] law in conflict." *Tischmann,* 882 F. Supp. at 1366 (citing *Hutner v. Greene*, 734 F.2d 896, 899 [2d Cir. 1984]).

## III.   ANALYSIS

### A.   Whether New York or Ohio Law Governs this Diversity Action

After carefully considering the matter, Court finds that New York has the "greatest interest in [this] litigation." *Tischmann,* 882 F. Supp. at 1366 (citing *Hutner*, 734 F.2d at 899). This is because (1) Plaintiff filed its claims against Defendant, a New York corporation, in New York (Dkt. No. 1, 12; Dkt. No. 42 at 1; Dkt. No. 56, Attach. 8 at 1), and (2) in their memoranda of law, both parties cite New York law (*see generally* Dkt. No. 43; Dkt. No. 56, Attach. 6; Dkt. No. 57).  For these reasons, the Court finds that the law of the State of New York applies.

### B.   Whether the Parties' Contract Precludes Plaintiff from Asserting a Claim of Negligence, Because Defendant Did Not Breach a Duty to Plaintiff Independent of Its Duties to Plaintiff Under the Contract

After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated in Defendant's memorandum of law.  (Dkt. No. 43 at 2-8.)  The Court adds only the following brief analysis.

Although some fact patterns sound plainly in tort or contract, other fact patterns fall somewhere in between.  *Sommer v. Fed. Signal Corp.*, 79 N.Y.2d 540, 551 (N.Y. 1992).  The New York State Court of Appeals has identified these in-between cases as "border-land" cases, and describing them in the following manner:

> Between actions plainly *ex contractu* and those as clearly *ex delicto* there
> exists what has been termed a border-land, where the lines of distinction
> are shadowy and obscure, and the tort and the contract so approach each
> other, and become so nearly coincident as to make their practical
> separation somewhat difficult.

*Sommer*, 79 N.Y.2d at 550-51 (citing *Rich v. N.Y. cent. & Hudson Riv. R.R. Co.*, 87 N.Y. 382,

390 N.Y. 1882).  These border-land cases generally arise when the parties' relationship is

initially formed by contract, and later it is alleged that the contract was performed negligently.

*Sommer*, 79 N.Y.2d at 551.

To determine whether, in a border-land case, a plaintiff may sustain tort *and* breach-of-

contract claims arising from a common set of facts, the test is whether the defendant breached an

independent, extra-contractual, duty to the plaintiff.  More specifically, a plaintiff may sustain a

tort claim, in addition to a breach-of-contract claim, against a defendant if the defendant (1)

breached a duty of reasonable care distinct from its contractual obligations, or (2) engaged in

tortious conduct separate and apart from its failure to fulfill its contractual obligations.  *New

York Univ. v. Cont'l Ins. Co.*, 87 N.Y.2d 308, 316 (N.Y. 1995); *Sommer*, 79 N.Y.2d at 551.

Generally, New York State courts have considered the following four "guideposts" in

determining whether tort and breach-of-contract claims may exist side-by-side.  *Sommer*, 79

N.Y.2d at 552.  First, New York State courts look at whether a legal duty, independent of

contractual obligation, may be imposed as a matter of law, incident to the parties' relationship.

*Id.* at 551.  For example, "[p]rofessionals, common carriers and bailees . . . may be subject to tort

liability for failure to exercise reasonable care, irrepsective of their contractual duties . . .

[because] [i]n these instances, it is policy, not the parties' contract, that gives rise to a duty of

care."  *Id.* (citations omitted).

Second, New York State courts look at the nature of the injury alleged.  *Sommer*, 79 N.Y.2d at 552.  For example, the Appellate Division has explained that "the nature of the harm, particularly whether it is 'catastrophic,' [is] 'one of the most significant elements in determining whether the nature of the . . . services rendered gives rise to a duty of reasonable care independent of the contract itself.'"  *Verizon N.Y. Inc. v. Optical Commc'ns Group, Inc.*, 91 A.D.3d 176, 181 (N.Y. App. Div. 1st Dep't 2011) (quoting *Tr. of Columbia Univ. in City of N.Y. v. Gwathmey Siegel & Assoc. Architects*, 192 A.D.2d 151, 154 [N.Y. App. Div. 1st Dep't 1993]).[2] However, New York courts have declined to permit side-by-side tort and breach-of-contract claims in cases only involving "economic harm."  *See Verizon N.Y. Inc.*, 91 A.D.3d at 181 (finding that the plaintiff cannot recover in tort because, *inter alia*, the nature of the harm was "solely financial and not typical of harm arising from tort") (quotation marks and alterations omitted).  This is because, where a plaintiff suffers only economic loss, it loses "part of its bargain, and the parties are relegated to the contractual remedies they negotiated . . . ."  *Syracuse Cablesys. v. Niagra Mohawk Power*, 173 A.D.2d 138, 142 (N.Y. App. Div. 4th Dep't 1991).

Third, New York State courts look at the manner in which the injury occurred.  *Sommer*, 79 N.Y.2d at 552.  More specifically, courts look at whether the injury resulted from "an abrupt, cataclysmic occurrence," or "a process of failure of the product to perform as anticipated under

---

[2]        *See, e.g., Duane Reade v. SL Green Operating P'Ship, LP*, 30 A.D.3d 189, 190-91 (N.Y. App. Div. 1st Dep't 2006) (finding that plaintiff's negligence claim survived where defendant-landlord's reduction of heat in a commercial building caused $500,000 in damages when the building's pipes burst); *Trustees of Columbia Univ. in City of N.Y.*, 192 A.D.2d at 154 (finding that plaintiff's tort claim survived where the defendant failed to adequately design and construct a campus building, and where the "potential[ for] fatal disaster was averted only by sheer chance"); *Sommer*, 79 N.Y.2d at 552-53 (finding that the plaintiff's tort claim survived where the defendant's failure to fulfill its contractual obligation resulted in a "four alarm fire" and lawsuits seeking damages exceeding $7 million).

normal business conditions." *See Bellevue South Assocs. v. HRH Constr. Corp.*, 78 N.Y.2d 282, 293 (N.Y. 1991) (denying the plaintiff recovery in tort because, *inter alia*, "[t]he injury. . . was not personal injury or property damage, but solely injury to the product itself[, and because] [t]he injury. . . was not an abrupt, cataclysmic occurrence"); *Sommer*, 79 N.Y.2d at 552 (allowing the plaintiff to recover in tort because, *inter alia*, the plaintiff's damages arose from an abrupt, cataclysmic occurrence).[3]

Fourth–and this factor is related to the second factor described above–New York State courts consider the nature of the relief sought. *See Sommer*, 79 N.Y.2d at 552 ("Thus, where plaintiff is essentially seeking enforcement of the bargain, the action should proceed under a contract theory"); *Bellevue*, 78 N.Y.2d at 293 (denying the plaintiff recovery in tort because, *inter alia*, the plaintiff sought only replacement cost of the damaged tiles); *Bristol-Myers Squibb, Indus. Div.*, 206 A.D.2d at 179 (dismissing the plaintiff's negligence claim where the plaintiff sought to recover damages for the loss in production and lost profits from the projected sale of the lost penicillin); *cf. Verizon N.Y., Inc.*, 91 A.D.3d at 182 (finding that "the resulting harm [is a] relevant factor[] in considering whether claims for breach of contract and tort may exist side by side").

------

[3]       *See also Bristol-Meyers Squibb, Indus. Div. v. Delta Star*, 206 A.D.2d 177, 180 (N.Y. App. Div. 4th Dep't 1994) (dismissing the plaintiff's negligence claim because, *inter alia*, the injury [i.e., loss of electricity, causing the loss of 40,000 kilograms of penicillin] "resulted from a process of failure of the product to perform as anticipated under normal business conditions – a traditional breach of contract situation") (quotation marks and citations omitted); *Trustees of Columbia Univ. in City of N.Y.*, 192 A.D.2d at 153 (finding that the plaintiff's negligence claim survives because, *inter alia*, the defendant's construction of a university building resulted in a large chunk of the facade falling into a university courtyard); *Syracuse Cablesys.*, 173 A.D.2d at 143 (permitting the plaintiff to proceed in tort because, *inter alia*, the "damages were caused by a sudden, accidental and cataclysmic explosion of the transformer").

Here, as to the first guidepost, the Court finds, based on the current record, that the parties' relationship did not give rise to an independent legal duty outside of their contractual obligations.  *See Sommer*, 79 N.Y.2d at 552 (noting that one of the factors to consider in determining whether the defendant breached an independent, extra-contractual, duty to the plaintiff is whether the parties' relationship gives rise to an independent duty as a matter of law). More specifically, the parties' relationship arose solely from their agreements for repair and maintenance services on the Project.  (Dkt. No.56, Attach. 5 at ¶ 8.)

As to the second guidepost, the Court finds, based on the current record, that the nature of the injury alleged in this case is economic.  Indeed, the nature of the injury alleged in this case is similar to the harm complained of in *Bristol-Myers Squibb, Indus. Div.*, in which the Appellate Division held that the plaintiff could not recover in tort.  More specifically, the plaintiff in that case alleged that the defendant was negligent in its installation of a transformer, and as a result, the transformer shutdown, turning off electricity to compressors supplying air for the fermentation of penicillin, which ultimately caused 40,000 kilograms of lost production and lost revenue.  *Bristol-Myers Squibb, Indus. Div.*, 206 A.D.2d at 178-79.  More specifically, here, Plaintiff alleges that Defendant was negligent in its repair of Unit 2, and as a result, Unit 2 shutdown, which ultimately caused lost production of power and lost revenue.  (*See generally* Dkt. No. 12 [Plf.'s Am. Cmplt.].)

In addition, Plaintiff alleges that its losses include the amount it cost to repair Unit 2 and lost revenue.  (Dkt. No. 12 at ¶ 36 [Plf.'s Am. Compl.]; *see also* Dkt. No. 56, Attach. 6 at 20 [attaching page "16" of Plf.'s Opp'n Memo. of Law].)  In the Court's view, these are economic losses, because they allegedly result from Defendant's alleged nonperformance of the contract (i.e., Defendant's alleged failure to properly adjust and tighten Unit 2's Ringfeders).  *See*

13

*Syracuse Cablesys.*, 173 A.D.2d at 142 (defining economic loss as "the result from product nonperformance") (quotation marks omitted).

Finally, in comparing the incident in question to the accident that occurred at the Sayano-Shushenskaya hydroelectric power station in Russia, Plaintiff acknowledges that the harm in this case was only *potentially* catastrophic, not *actually* catastrophic.  (Dkt. No. 56, Attach. 6 at 19-20 [attaching pages "15" and "16" of Plf.'s Opp'n Memo. of Law].)  *See Verizon N.Y., Inc.*, 91 A.D.3d at 181 ("[T]he nature of the harm, particularly whether it is 'catastrophic,' [is] one of the most significant elements in determining whether the nature of the type of services rendered gives rise to a duty of reasonable care independent of the contract itself.") (quotation marks omitted).

As to the third guidepost, the Court finds, based on the current record, that the manner in which Plaintiff's alleged injuries occurred was neither abrupt nor cataclysmic.  More specifically, the Court finds that the failure of Unit 2's wicket gates to shut after Unit 2 was tripped off-line is not the kind of "abrupt, cataclysmic occurrence" that gives rise to tort liability.[4]  Rather, the Court finds that the failure of Unit 2's wicket gates to shut after Unit 2 tripped off-line is more akin to a product failure under normal business conditions.  Indeed,

---

[4]     *Compare Sommer*, 79 N.Y.2d at 553 (allowing the plaintiff to recover in tort because it sought "recovery of damages for a fire that spread out of control–the sort of 'abrupt, cataclysmic occurrence' referred to in *Bellevue*") *and Syracuse Cablesys.*, 173 A.D.2d at 143 (allowing the plaintiff to recover in tort because the explosion of the transformer was a "sudden, accidental and cataclysmic occurrence") *with Bellevue*, 78 N.Y.2d at 294 (holding that "delamination of the tile [for which the plaintiff contracted the defendant to install] . . . was not an abrupt, cataclysmic occurrence, . . . but a process of failure of the product to perform as anticipated under normal business conditions") *and Bristol-Myers Squibb, Indus. Div.*, 206 A.D.2d at 180 (denying the plaintiff recovery in tort because the alleged injuries occurred "not from any accidental occurrence," but from "a failure of the product [for which the parties contracted] to perform as anticipated under normal business conditions").

14

according to Plaintiff's own allegations, the wicket gates are *designed* to close "upon shutdown or during a 'trip'"; the Ringfeders are *designed* to act as a safety device when a wicket gate becomes obstructed; and the wicket gates are *designed* to close on command.  (Dkt. No. 12 at ¶¶ 12-13 [Plf.'s Am. Compl.].)  Also, John Charles Ahlrichs, one of Plaintiff's representatives, admitted that it is "a matter of course" for Unit 2 to be tripped offline in any given month.  (Dkt. No. 23, Attach. 1 at 86 [Ahlrichs' Depo. Tr.].; *see also* Dkt. No. 27, Attach. 1 at 1 [Depo. Tr. of Plf.'s employee, who testified that "minor trips" occur "maybe once or twice a month"].)  These allegations and admissions suggest that any number of circumstances may arise in the normal course of business that may require the wicket gates and Ringfeders to operate as designed, including during a "trip."  (*Id.*)  Because Plaintiff alleges that it sustained injuries as a result of Defendant's failure to meet its obligations under the contract (i.e., properly adjust and tighten Unit 2's Ringfeders), and because the Ringfeders (if properly adjusted and tightened) are designed to operate in a certain manner during a normal "trip," the Court finds that the manner in which the alleged injury occurred resulted from Defendant's alleged failure to perform under the contract.

As for the fourth guidepost, the Court finds, based on the current record, that Plaintiff essentially seeks enforcement of the bargain it undertook with Defendant, because Plaintiff seeks damages for the repair of Unit 2 and lost revenue resulting from Defendant's allegedly negligent repair and replacement of the Ringfeders on Unit 2.  *See Bristol-Myers Squibb, Indus. Div.*, 206 A.D.2d at 180 (denying the plaintiff recovery in tort where the plaintiff sought damages for repair of the transformer and lost revenue and holding that, "[b]ecause the damage allegedly suffered by plaintiff arises from the failure of the repaired transformer to perform as intended and not from any accidental occurrence, plaintiff is relegated to contractual remedies for economic loss.").

For all of these reasons, Defendant's motion for summary judgment is granted as it relates to Plaintiff's negligence claim.

> **C.      Whether the Terms and Conditions Printed on the Reverse Side of the Invoice Are Enforceable, So as to Preclude Plaintiff from Recovering an Award of Consequential Damages**

After carefully considering the matter, the Court answers this question in the negative for the reasons explained below.

Because the parties do not dispute that the existence of an oral contract (*compare* Dkt. No. 42 at ¶ 3 [Def.'s Statement of Material Facts] *with* Dkt. No. 56, Attach. 8 at ¶ 3 [Plf.'s response to Def.'s Statement of Material Facts]), the threshold issue, in answering the above-described question, is whether the Terms and Conditions on the reverse side of the invoice were incorporated into the parties' oral contract.

Generally, to determine whether a provision became a part of an oral contract for services, the Court looks at the parties' course of dealing.  *See e.g., ABN AMRO Verzekeringen BV v. Geologistics Ams., Inc.*, 253 F. Supp.2d 757, 767 (S.D.N.Y. 2003) ("A course of dealing is used to add the terms to the-often oral-contract governing the damaged shipment at issue.").[5]

More specifically, "where there is an established prior course of dealings" between two parties, the parties "may limit liability by terms and conditions."  *United B Int'l Corp. v. UTI United States, Inc.*, No. 34561/02, 2004 WL 2563795, at *2 (N.Y. Sup. Ct. Kings Cnty. Nov. 4, 2004); *see, e.g., Calvin Klein Ltd. v. Trylon Trucking Co.*, 892 F.2d 191, 195 (2d Cir. 1989) (upholding a $50.00 limitation of liability where the parties were business entities with an ongoing commercial relationship involving numerous prior transactions); *cf. M.E. Int'l, Inc. v.*

---

[5]      "A course of dealing is a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct."  U.C.C. § 1-205(1).

*Schenkers Int'l Forwarders, Inc.*, 88-CV-1429, 1990 WL 83524, at *4 (S.D.N.Y. June 8, 1990) (holding that the limited-liability provisions of earlier transactions did not apply to the transaction giving rise to litigation because the plaintiff "was not experienced in these transactions and had no actual[] knowledge of these prior terms").

However, a provision limiting liability will be enforceable only if it was the result of an open and fair negotiation between the parties, and the plaintiff was afforded the opportunity to pay a higher contract price in exchange for increased liability coverage. *See Calvin Klein Ltd.*, 892 F.2d at 196 (finding that the provision limiting the defendant's liability to $50.00 was enforceable because the plaintiff "was free to adjust the limitation"); *Shippers Nat. Freight Claim Council, Inc. v. I.C.C.*, 712 F.2d 740, 746 (2d Cir. 1983) ("Accordingly, so long as the limitation of liability was the result of a fair, open, just and reasonable agreement' . . . and the [plaintiff] was given the option of higher recovery upon paying a higher rate, the agreement [is] enforceable at common law.") (quotation marks and citations omitted).[6]

Having said that, "awareness of and explicit assent to [provisions limiting the defendant's liability] is not required." *United B Int'l Corp.*, 2004 WL 2563795, at *2; *see also Silas R. Hill v. The Syracuse, Binghamton and N.Y. R.R. Co.*, 28 Sickles 351, at *2 (N.Y. 1878) ("By accepting the contract without objection, the other party had a right to assume that he assented to its terms, and the fact of not reading it cannot be interposed to prevent the legal effect of the transaction.").

---

[6]     *See also Gen. Elec. Co. v. Harper Robinson & Co.*, 818 F. Supp. 31, 35 (E.D.N.Y. 1993) (enforcing the provision limiting the defendant's liability because, *inter alia*, "the invoices . . . gave [the plaintiff] the option of paying special increased compensation"); *United B Int'l Corp.*, 2004 WL 2563795, at *2 (enforcing the provision in the defendant's invoice limiting the defendant's liability because "the invoice gave [the] plaintiff . . . the option of paying special increased compensation in exchange for increased coverage of the full value of the shipment").

Here, the parties are commercial entities that have conducted similar business transactions to the one giving rise to this litigation on numerous occasions since 2000.[7]  (Dkt. No. 24, Attach. at 40; Dkt. No. 56, Attach. 5 at ¶ 8.)  More specifically, when Plaintiff needs Defendant's mechanical services, Plaintiff contacts Defendant.  (Dkt. No. 24, Attach. 1 at 40-41; Dkt. No. 56, Attach. 5 at ¶ 8; Dkt. No. 26, Attach. 1 at 53-55.)  Upon completion of the work requested, Defendant provides Plaintiff with an invoice.  (Dkt. No. 23, Attach. 1 at 57; Dkt. No. 56, Attach. 5 at ¶ 9.)  Since the year 2000, Defendant has used a form invoice that has the Terms and Conditions pre-printed on the reverse-side.  (Dkt. No. 56, Attach. 2 at 2.)  Once Plaintiff receives the invoice, its representatives review it and then send to its accounts-payable department to be paid.  (Dkt. No. 24, Attach. 1 at 42; Dkt. No. 56, Attach. 5 at ¶ 9.)[8]  If Plaintiff finds the invoice's amount-due inconsistent with its own records, a representative from Plaintiff calls Lewis to inquire about the inconsistency.  (Dkt. No. 26, Attach. 1 at 68-70.)

Because of the above-described legal standard (pursuant to which awareness of, and explicit assent to, provisions limiting a defendant's liability is not required), the Court will set aside the issue of whether, based on these facts, a genuine dispute of material fact exists as to whether Plaintiff knew or should have known about the existence of the Terms and Conditions during the time in question.  More important is the fact that, based on the current record, there is no genuine dispute of material fact as to whether the Terms and Conditions resulted from the

---

[7]      The Court notes that there is record evidence that Defendant has provided mechanical services to the Project since, at least, the 1980s (Dkt. No. 56, Attach. 1 at 16), but, because Defendant has been using the Terms and Conditions since approximately 2000 (Dkt. No. 56, Attach. 2 at 2), and Plaintiff's Chief Executive Officer's involvement in the Project began in 1999 (Dkt. No. 24, Attach. 1 at 7; Dkt. No. 56, Attach. 5 at ¶¶ 1, 6), the Court finds that the only relevant transactions between the parties are those that have occurred since 2000.

[8]      Plaintiff's CEO testified that, at no time prior to January 9, 2008, did he look at the reverse-side of the invoice or have any awareness of the Terms and Conditions stated thereon.  (Dkt. No. 24, Attach. 1 at 43; Dkt. No. 56, Attach. 5 at ¶ 10.)

parties' negotiations, or whether Defendant provided Plaintiff with the opportunity to pay a

higher contract price in exchange for increased liability.[9]

More specifically, Defendant admits that "[a]t no time while Defendant performed

services at the Project were there any negotiations between Defendant and the owners of the

Glen Park facility (whether it was Plaintiff or any other ownership entity) regarding Defendant's

purported terms and conditions." (*Compare* Dkt. No. 56, Attach. 8 at ¶ 1 [Plf.'s Response to

Def.'s Statement of Facts] *with* Dkt. No. 58 at ¶ 1 [Def.'s Reply to Plf.'s Response to Def.'s

Statement of Facts]; *see also* Dkt. No. 56, Attach. 1 at 17, 18 [Lewis testifying that the parties

never discussed any terms and conditions].) This admission supplements Plaintiff's assertions.

(Dkt. No. 56, Attach. 5 at ¶ 12.) In addition, Defendant admits that it "never provided Plaintiff

with 'a voluntary choice' of paying an additional premium for the services on a graduate scale

proportional to the risk involved in the services rendered." (*Compare* Dkt. No. 56, Attach. 8 at ¶

5 [Plf.'s Response to Def.'s Statement of Facts] *with* Dkt. No. 58 at ¶ 5 [Def.'s Reply to Plf.'s

Response to Def.'s Statement of Facts].)

For these reasons, the Court finds the Terms and Conditions are not enforceable against

Plaintiff, and Defendant's motion for summary judgment as it relates to whether the Terms and

Conditions preclude Plaintiff from recovering consequential damages is denied.

**D.**     **Whether, in the Alternative, the Parties' Contract Precludes Plaintiff from
Recovering Consequential Damages for Lost Revenue, Because Those
Damages Were Unforeseeable at the Time the Parties Contracted**

After carefully considering the matter, the Court answers this question in the negative. "It

is well settled that in breach of contract actions 'the nonbreaching party may recover general

---

[9]      As explained above in the above-described legal standard, a provision limiting
liability will be enforceable only if it was the result of an open and fair negotiation between the
parties, and the plaintiff was afforded the opportunity to pay a higher contract price in exchange
for increased liability coverage.

damages which are the natural and probable consequence of the breach.'" *Bi-Econ. Mkt., Inc. v. Harleysville Ins. Co. of N.Y.*, 10 N.Y.3d 187, 192 (N.Y. 2008) (quoting *Kenford Co. v. County of Erie*, 73 N.Y.2d 312, 319 [N.Y. 1989]).  "Special, or consequential damages, which 'do not so directly flow from the breach,' are also recoverable in limited circumstances."  *Bi-Econ. Mkt., Inc.*, 10 N.Y.3d at 192 (quoting *Am. List Corp. v. U.S. News & World Report*, 75 N.Y.2d 38, 43 [1989]).  The New York State Court of Appeals has explained that those circumstances exist where the consequential damages were reasonably foreseeable by the parties:

> [T]he party breaching the contract is liable for those risks foreseen or which should have been foreseen at the time the contract was made.  It is not necessary for the breaching party to have foreseen the breach itself or the particular way the loss occurred, rather, it is only necessary that loss from a breach is foreseeable and probable.

*Bi-Econ. Mkt., Inc.*, 10 N.Y.3d at 192 (quotation marks, citations, and alterations omitted).  "To determine whether consequential damages were reasonably contemplated by the parties, courts must look to the nature, purpose and particular circumstances of the contract known by the parties as well as what liability the defendant fairly may be supposed to have assumed consciously, or to have warranted the plaintiff reasonably to suppose that it assumed, when the contract was made."  *Id.* (quotation marks, citations, and alterations omitted).

Here, Defendant argues that it did not actually contemplate whether, as a result of Defendant's failure to perform under the contract, Plaintiff would suffer lost revenue.  (Dkt. No. 43 at 14-15.)  However, Defendant fails to support this argument with any citation to the record. (*See generally id.*)  Furthermore, based on its review of the record, the Court has not found any evidence that supports Defendant's argument.  Indeed, the Court finds the argument to be somewhat incredible, given that Defendant saw the need to attempt to limit its liability for consequential damages (which often include lost income) on the reverse side of its invoices to Plaintiff for the work it performed for Plaintiff since 2000.  Finally, the Court finds that, even if

it were true that Defendant did not actually contemplate whether Plaintiff would suffer lost revenue as a result of Defendant's failure to perform under the contract, the Court would find such lack of contemplation to have been unreasonable given the nature of the mechanical services that Defendant was performing for Plaintiff (including inspecting, cleaning, and adjusting the wicket gates of a unit of a hydroelectric facility, and removing, replacing, tightening, and adjusting every Ringfeder for each wicket gate in that unit).  Simply stated, lost revenue was reasonably foreseeable, under the circumstances.

For these reasons, Defendant's motion for summary judgment as to whether the contract precludes Plaintiff from recovery lost revenue is denied.

**ACCORDINGLY,** it is

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 21) is **<u>GRANTED</u>** **in part** and **<u>DENIED</u>** **in part** as set forth above in Parts III.A. through III.D. of this Decision and Order; and it is further

**ORDERED** that Plaintiff's negligence claim against Defendant is **<u>DISMISSED</u>** with prejudice; and it is further

**ORDERED** that Plaintiff's only remaining claim in this action is for breach-of-contract; and it is further

**ORDERED** that Plaintiff is not precluded (by the terms and conditions printed on the reverse side of the invoice) from recovering an award of consequential damages, nor is Plaintiff precluded (by the parties' contract) from recovering consequential damages for lost revenue; and it is further

**ORDERED** that counsel are directed to appear on NOVEMBER 9, 2012 at 1:30 p.m. in chambers for a pretrial conference, at which counsel are directed to appear with settlement authority, and in the event that the case does not settle, trial will be scheduled at that time. Plaintiff is further directed to forward a written settlement demand to defendants no later than October 19, 2012, and the parties are directed to engage in meaningful settlement negotiations prior to the 11/9/12 conference.  In the event that counsel find that settlement is unlikely, if counsel would prefer to participate in this pretrial conference via telephone conference for the limited purpose of scheduling trial, counsel should make that request in writing.

Dated: September 20, 2012
         Syracuse, New York

Hon. Glenn T. Suddaby
U.S. District Judge