UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

NORTHBROOK NY, LLC,

                        Plaintiff,           7:09-CV-0792
                                                        (GTS/TWD)
v.

LEWIS & CLINCH, INC.,

                        Defendant.
_____

APPEARANCES:                                               OF COUNSEL:

THE CHARTWELL LAW OFFICES, LLP        JOHN M. WUTZ, ESQ.
  Counsel for Plaintiff                                GEOFFREY W. VEITH, ESQ.
1735 Market Street, 29th Floor
Philadelphia, Pennsylvania 19103

OSBORN, REED & BURKE, LLP                JEFFREY M. WILKENS, ESQ.
  Counsel for Defendant
One Exchange Street
Rochester, New York 14614

GLENN T. SUDDABY, United States District Judge

## DECISION and ORDER

      Currently before the Court, in this negligence and breach-of-contract action filed by Northbrook NY LLC ("Plaintiff") against Lewis & Clinch, Inc. ("Defendant"), is Plaintiff's motion to preclude the testimony of Defendant's expert, Lee H. Sheldon P.E. ("Sheldon") or, in the alternative, to hold a *Daubert* hearing (Dkt. No. 20), and Defendant's cross-motion to strike the Statement of Undisputed Material Facts that Plaintiff submitted with its motion (Dkt. No. 53 at 6). For the reasons set forth below, Plaintiff's motion is denied as without cause, and Defendant's cross-motion is denied as moot.

I.  **RELEVANT BACKGROUND**

    A.  **Plaintiff's Claims**

Plaintiff filed its Complaint in this diversity-jurisdiction action on July 10, 2009. (Dkt. No. 1.) Plaintiff subsequently filed an Amended Complaint on December 7, 2009. (Dkt. No. 12 [Plf.'s Am. Compl.].) Generally, Plaintiff's Amended Complaint alleges as follows.

Plaintiff owns and operates a hydroelectric facility located on the Black River in Glen Park, New York, known as the Glen Park Hydroelectric Project ("the Project"). (*Id*. at ¶ 7.) The Project consists of three hydro turbine units, which are identified numerically as units 1, 2, and 3 ("Unit 1," "Unit 2," and "Unit 3"). (*Id.* at ¶ 8.) Each hydro turbine unit is powered by the controlled flow of river water through the turbine and over the turbine's runner blades. (*Id.*) After passing over the runner blades, the water exits through the draft tube into what is called the "tail race," and returns to the river. (*Id.*) Within the tail race exists a draft tube gate that may be closed to isolate the turbine from the river. (*Id.*)

The amount of water entering the turbine is controlled by opening, closing, or otherwise adjusting the size of the opening of the turbine's wicket gates. (*Id.* at ¶ 9.) The wicket gates can be turned to enlarge (open) or reduce (close) the wicket-gate opening through which water may enter the turbine. (*Id.*) The size of the opening of the wicket gates determines the rate at which the water flows into the turbine. (*Id.*)

The position of each individual wicket gate is controlled by a mechanism that includes an actuator arm and a keyless, shaft-hub locking device called a "Ringfeder." (*Id.* at ¶ 10.) A properly tightened Ringfeder connects the actuator arm to the wicket gate shaft in a manner that allows movement of the actuator arm to turn the wicket gate. (*Id.* at ¶ 11.)

In addition, a properly tightened (and correctly applied) Ringfeder also acts as a safety device.  (*Id.* at ¶ 12.)  More specifically, should the wicket gate hang up or become obstructed or immobile, the Ringfeder is designed to give or slip to prevent overload, damage, or failure of the mechanism.  (*Id.*)  The wicket gates can be closed on command to prevent any water from flowing into turbine.  (*Id.* at ¶ 13.)

Upon shutdown of a hydro turbine unit, or during a "trip," the wicket gates are commanded to close.  Because this prevents water from entering the turbine, the turbine stops rotating.  (*Id.* at ¶ 14.)  The draft tube gates do not close during normal shutdowns or trips.  (*Id.*)

On January 9, 2008, disturbances on the National Power Grid power lines tripped all three of the Project's hydro turbine units off-line ("the incident").  (*Id.* at ¶ 15.)  Although Units 1 and 3 shut down normally, several wicket gates for Unit 2 failed to close, which allowed water to continue to flow through the turbine.  (*Id.* at ¶ 16.)  The continuous flow of water during the shutdown allowed the turbine to continue rotating, and caused the turbine's speed to dangerously increase.  (*Id.*)  An overspeed protection device within Unit 2 sensed the increasing turbine speed, which signaled the draft tube gate to close in an effort to stop the water and prevent a potentially catastrophic overspeed condition.  (*Id.* at ¶ 17.)  The operation of the overspeed device, as well as the closing of the draft tube gates, ultimately shut down Unit 2.  (*Id.* at ¶ 18.)

The wicket gates that failed to close did so because, although the actuator arms had moved to the "closed" position, the Ringfeders were too loose and slipped.  (*Id.* at ¶ 19.)

Following the incident, while Units 1 and 3 restarted without issue, Unit 2 failed to restart.  (*Id.* at ¶¶ 20-22.)  Unit 2 could not restart until it was dewatered; however, this required the repair of the draft tube gate seals.  (*Id.* at ¶ 23.)  These draft tube gate seals were damaged

when the draft tube gate was forced closed against the excessively high volume and velocity of water flowing through the open wicket gates during the incident. (*Id.*) After new draft tube gate seals were fabricated and installed, Unit 2 was repaired and returned to service on March 3, 2008. (*Id.* at ¶¶ 24-25.)

Approximately four months before the incident (specifically, between September 17, 2007, and September 25, 2007), Defendant performed a variety of mechanical services on Unit 2, including inspecting, cleaning, and adjusting the wicket gates, and removing, replacing, tightening, and adjusting every Ringfeder for each wicket gate. (*Id.* at ¶¶ 26-27.)

The work that Defendant performed on Unit 2 fell below the standard of care that Defendant owed Plaintiff, because Defendant improperly tightened the Ringfeders by leaving them too loose, which ultimately caused, among other things, the damage to the draft tube seals. (*Id.* at ¶¶ 32-36.) In addition, this failure to sufficiently tighten the Ringfeders violated the terms of the parties' contract, which called for the Ringfeders to be tightened and adjusted consistent with the manufacturer's instructions and specifications. (*Id.* at ¶¶ 38, 40.)

Based on all of these factual allegations, Plaintiff asserts two claims against Defendant–one for negligence and the other for breach of contract. (*Id.* at ¶¶ 31-43.) As relief, Plaintiff seeks $895,645.08 in damages, which constitutes $135,959.00 in property damage, and $759,686.08 in lost revenue. (*Id.* at ¶¶ 36, 43.)

### B.  The Parties' Briefing on Plaintiff's Motion to Preclude and Defendant's Cross-Motion to Strike

Generally, and liberally construed, in support of its motion to preclude the testimony of Defendant's expert, Lee Sheldon, Plaintiff makes the following three arguments. First, Plaintiff argues Sheldon is not qualified to provide "opinions on structural matters" because he is not a structural engineer. (Dkt. No. 20, Attach. 11 at 11, 14.) Second, Plaintiff argues Sheldon's

4

opinions are unsupported by sufficient facts or data, and in any event, are the product of unreliable principles and methods. (*Id.* at 12-14.) Third, Plaintiff argues, in the alternative, a *Daubert* hearing is necessary to assess the admissibility of Sheldon's testimony. (*Id.* at 15-16.)

Generally, in response to Plaintiff's motion to preclude, Defendant makes the following five arguments. First, Defendant argues, Plaintiff's motion to preclude fails to include a supporting affidavit in violation of Local Rule 7.1(a)(1)-(2) of the Local Rules of Practice for this Court. (Dkt. No. 53 at 5-6.) Second, Defendant argues, Sheldon is qualified based on his education and experience to testify about the performance of a hydraulic turbine. (*Id.* at 12-15.) Third, Defendant argues, Sheldon's opinions are admissible notwithstanding the fact that his conclusions are supported neither by published studies nor self-administered tests. (*Id.* at 15-20.) Fourth, Defendant argues, a *Daubert* hearing is neither necessary nor in the best interests of judicial economy. (*Id.* at 20.) Fifth, Defendant argues, the Statement of Undisputed material Facts that Plaintiff submitted with its motion is procedurally improper, because Plaintiff's motion is not made pursuant to Fed. R. Civ. P. 56 and Local Rule 7.1(a)(3). (*Id.* at 6.)

Generally, in its reply, Plaintiff expands on its argument that Sheldon's opinions are not supported by the evidence, scientific studies or tests, or specific engineering or scientific literature. (*See generally* Dkt. No. 60.)

## II. LEGAL STANDARD GOVERNING EXPERT TESTIMONY

Under Fed. R. Evid. 702, before a witness may be certified as an expert, he must be found to be "qualified" as an expert "by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Specifically, the rule provides as follows:

5

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness ***qualified*** as an expert by ***knowledge, skill, experience, training, or education***, may testify thereto in the form of opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods to the facts of the case.

Fed. R. Evid. 702 (emphasis added).  Under this rule, the trial judge stands as a "gatekeeper," charged with determining whether the proffered testimony satisfies a number of standards, including whether the proposed expert is "qualified" to give the proffered opinion.  *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 589-90, 597 & nn. 7, 10 (1993).

"To determine whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony."  *U.S. v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004) (citation omitted).  In assessing whether a proposed expert is "qualified," the trial judge should remember the "liberal[] purpose" of Fed. R. Evid. 702, and remain "flexibl[e]" in evaluating the proposed expert's qualifications.  *See U.S. v. Brown*, 776 F.2d 397, 400 (2d Cir. 1985) (holding that Fed. R. Evid. 702 "must be read in light of the liberalizing purpose of the rule"); *Lappe v. Am. Honda Motor Co.*, 857 F. Supp. 222, 227 (N.D.N.Y 1994 (Hurd, M.J.) ("[L]iberality and flexibility in evaluating qualifications should be the rule; the proposed expert should not be required to satisfy an overly narrow test of his own qualifications."), *aff'd without opinion*, 101 F.3d 68 (2d Cir. 1996).  Having said that, of course, "a district court may properly conclude that witnesses are insufficiently qualified . . . [where] their expertise is too general or too deficient."  *Stagl v. Delta*, 117 F.3d 76, 81 (2d Cir. 1997), *accord*, *Dreyer v. Ryder Auto. Carrier Group, Inc.*, 367 F. Supp.2d 413, 425-26 (W.D.N.Y 2005); *Byrne v. Liquid Asphalt Systems, Inc.*, 238 F. Supp.2d 491, 494 (E.D.N.Y. 2002); *Trumps v. Toastmaster*, 969 F. Supp. 247, 252 (S.D.N.Y. 1997); *see*,

*e.g.*, *McCullock v. H.B. Fuller Co.*, 981 F.2d 656, 657-58 (2d Cir. 1992) (affirming district court's ruling that plaintiff's proffered expert did not possess the required qualifications to testify as an expert on the subject of warning labels for hot melt glue).

A witness qualified as an expert will be permitted to testify if his testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue." *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999) (quoting Fed. R. Evid. 702). "To be admissible, expert testimony must be both relevant and reliable." *Melini v. 71st Lexington Corp.*, 07-CV-0701, 2009 WL 413608, at *4 (S.D.N.Y. Feb. 13, 2009) (citing *Daubert*, 509 U.S. at 589). "Specifically, expert opinion testimony must be (1) 'based upon sufficient facts or data,' (2) 'the product of reliable principles and methods,' and (3) the result of applying those principles and methods to the facts of the case in a reliable manner." *Melini*, 2009 WL 413608, at *4 (quoting Fed. R. Evid. 702). "The proponent of expert testimony must establish its admissibility by a preponderance of the evidence." *Id*. (citing *Astra Aktiebolag v. Andrx Pharm., Inc*., 222 F. Supp.2d 423, 487 [S.D.N.Y. 2002] [citing Fed. R. Evid. 104(a)]).

In *Daubert*, the Supreme Court set forth a non-exclusive list of factors for a trial court to use when assessing the reliability of expert testimony: (1) whether the expert's technique or theory can be, or has been, tested–that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability; (2) whether the technique or theory has been subject to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community. *Daubert*, 509 U.S. at 593-94; *see also* Fed. R. Evid. 702, Advisory Committee Notes: 2000 Amendments.

In addition, "[c]ourts both before and after *Daubert* have found other factors relevant in determining whether expert testimony is sufficiently reliable to be considered by the trier of fact." Fed. R. Evid. 702, Advisory Committee Notes: 2000 Amendments. These factors include the following: (1) whether the expert is "proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for the purposes of testifying";[1] (2) whether the expert has unjustly extrapolated from an accepted premise to an unfounded conclusion;[2] and (3) whether the expert has adequately accounted for obvious alternative explanations for the plaintiff's condition.[3]

The Second Circuit has further explained the trial court's duties when evaluating expert testimony in the following manner:

> First, . . . *Daubert* reinforces the idea that there should be a presumption of admissibility of evidence. Second, it emphasizes the need for flexibility in assessing whether evidence is admissible. Rather than using rigid 'safeguards' for determining whether testimony should be admitted, the Court's approach is to permit the trial judge to weigh the various considerations pertinent to the issue in question. Third, *Daubert* allows for the admissibility of scientific evidence, even if not generally accepted in the relevant scientific community, provided its reliability has independent support. Finally, the Court expressed its faith in the power of the adversary system to test 'shaky but admissible' evidence, and advanced a bias in favor of admitting evidence short of that solidly and indisputably proven to be reliable.

*Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir. 1995) (internal citation omitted). "A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an

---

[1] *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995).

[2] *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (noting that, in some cases, a trial court "may conclude that there is simply too great an analytical gap between the data and the opinion proffered").

[3] *See Claar Burlington N.R.R.*, 29 F.3d 499, 502 (9th Cir. 1994) (precluding expert's testimony where expert failed to consider other obvious causes for plaintiff's condition).

expert's opinion per se inadmissible." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002). Instead, "the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702, Advisory Committee's Note; *see also Equal Emp't Opportunity Comm'n v. Morgan Stanley & Co.*, 324 F. Supp.2d 451, 456 (S.D.N.Y. 2004); *U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union No. 3*, 313 F. Supp.2d 213, 226 (S.D.N.Y. 2004). "This principle is based on the recognition that 'our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony.'" *Melini*, 2009 WL 413608, at *5 (quoting *Amorgianos*, 303 F.3d at 267).

However, "when an expert opinion is based on data, methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos*, 303 F.3d at 266; *accord*, *Ruggiero v.. Warner-Lambert Co.*, 424 F.3d 249, 253 (2d Cir. 2005).[4] Furthermore, "it is critical that an expert's analysis be reliable at every step." *Amorgianos*, 303 F.3d at 267. Of course, "the district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." *Id*. at 266 (citing *Daubert*, 509 U.S. at 595). Nevertheless, "conclusions

---

[4] *See also Zaremba v. Gen. Motors Corp.*, 360 F.3d 355, 358-60 (2d Cir. 2004) (holding that expert testimony that was speculative and unreliable was properly not considered by the district court on summary judgment); *Dreyer*, 367 F. Supp.2d at 416-17 (noting that "[a]n otherwise well-credentialed expert's opinion may be subject to disqualification if he fails to employ investigative techniques or cannot explain the technical basis for his opinion"); *Dora Homes, Inc. v. Epperson*, 344 F. Supp.2d 875, 887-89 (E.D.N.Y. 2004) (declining to consider plaintiff's expert's testimony in deciding pending motions for summary judgment based on a finding that the expert's testimony "is unreliable under Fed. R. Evid. 702 and the principles articulated in *Daubert* and its progeny," given that the expert [1] qualified his opinions, [2] failed to support his opinions with any methodology which the Court could analyze, and [3] rested his opinions "upon nothing more than subjective belief and unsupported speculation"); *Mink Mart, Inc. v. Reliance Ins. Co.*, 65 F. Supp.2d 176, 180 (S.D.N.Y. 1999) ("In order for an expert's opinion to be reliable and thus admissible, it must be grounded on verifiable propositions of fact") (citations omitted), *aff'd*, 99-CV-9211, 2000 WL 33223395 (2d Cir. May 30, 2000).

9

and methodology are not entirely distinct from one another." *Gen. Elec. Co.*, 522 U.S. at 146. Accordingly "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id*.

Finally, the *Daubert* rule applies to scientific knowledge, as well as technical or other specialized knowledge.  *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999) ("We conclude that *Daubert's* general holding – setting forth the trial judge's general 'gatekeeping' obligation – applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge.") (citing Fed. R. Evid. 702).

### III.   ANALYSIS

After carefully considering the matter, the Court finds no reason to preclude Sheldon's testimony at trial or hold a *Daubert* hearing for the reasons stated in Defendant's memorandum of law.  (*See generally* Dkt. No. 53.)  The Court adds only four brief points.

First, Sheldon is sufficiently qualified as an expert under Fed. R. Evid. 702 because of his "knowledge, skill, experience, training, [and] education."  Fed. R. Evid. 702.  More specifically, Sheldon's curriculum vitae demonstrates that he is a professional engineer with "more than 30 years [of] experience in the design, procurement, installation and testing of hydraulic turbines . . . ."  (*Id.* at 32; Dkt. No. 46, Attach. 2 at 1.)  In addition, Sheldon testified during his deposition that he has approximately 43 years of experience working "almost exclusively in the hydropower industry," and has "authored and published about 26 technical papers, coauthored a college text book on hydropower engineering, tested [approximately] three or four dozen hydraulic turbines, performed forensic analysis on probably a dozen machines[ for] partial and total failures."  (Dkt. No. 20, Attach. 7 at 7.)  Beyond Sheldon's undergraduate degree in general engineering, he also has a Master's degree in fluid mechanics, and Naval engineering training that includes training at

Reserve Engineers School and qualification as an Engineering Duty Officer.  (*Id.* at 8.)  All of these credentials demonstrate that Sheldon is qualified as an expert in hydropower engineering through, at least, his education, experience, and training.  Fed. R. Evid. 702.

Second, generally, extrapolation is an acceptable method that engineering experts, like Sheldon, use in making their conclusions.  *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("Trained experts commonly extrapolate from existing data."); *Cedar Petrochem., Inc. v. Dongbu Hannong Chem. Co., Ltd.*, 769 F. Supp.2d at 284-85 (S.D.N.Y. 2011) ("Expert engineering testimony may rest on scientific foundations or on the personal knowledge or experience of the engineer, and trained experts commonly extrapolate from existing data.") (quotation marks and citations omitted).  In addition, although Plaintiff argues to the contrary,[5] the data from which an expert extrapolates need not be collected by the expert in order to be credible.  *Cedar Petrochem.*, 769 F. Supp. at 284 (citing Fed. R. Evid. 703); *see also Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85, 94 (2d Cir. 2000) ("[A]n expert may rely on data that she did not personally collect.").

Third, because the Court finds that the method used by Sheldon to arrive at his conclusions (i.e., extrapolation) is reliable, the Court is left to determine whether Sheldon used reliable data from which to extrapolate.  *Cf. Cedar Petrochem., Inc.*, 769 F. Supp.2d at 285 ("In this case, the experts have based their conclusion on reliable results from tests conducted by independent consultants and observed by representatives of numerous interested parties."); *Deutsch v. Novartis Pharm. Corp.*, 768 F. Supp.2d 420, 426 (E.D.N.Y. 2011) (finding that "whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded

---

[5] For example, Plaintiff argues that Sheldon's report is unreliable because, inter alia, "[h]e did no analysis of the concrete support structures . . .[, he] did not calculate the purported decrease in pressure in the semi-spiral case . . .[, and he] did no analysis or calculations regarding the amount of force . . . necessary to deflect or buckle the stay vanes . . . ." (Dkt. No. 20, Attach. 11 at 14.)

conclusion" is a relevant factor to consider in evaluating the admissibility of an expert's testimony).

Here, Sheldon's expert report listed the thirty items of evidence that he reviewed in making his conclusions and writing his report.  (Dkt. No. 20, Attach. 6 at 13-15.)  After carefully examining the nature of this evidence, the Court finds that it is reliable and appropriate under the circumstances.  For example, Sheldon reviewed Defendant's maintenance records from the September 2007, which is when Defendant conducted the maintenance on Unit 2 that is the subject of this litigation.  (*Id.* at 13.)  Sheldon also examined the transcripts from depositions and deposition exhibits arising from this litigation.  (*Id.*)  Although Sheldon's expert report also lists items that he was unable to review because Defendant's discovery demands for those items were purportedly unfulfilled, this does not make Sheldon's report and conclusions inadmissible. (*Id.* at 15; Dkt. No. 20, Attach. 7 at 5-6, 31-32.)  Rather, this information goes to the weight, not the admissibility, of the evidence, and is properly attacked on cross-examination.  *See Amorgianos*, 303 F.3d at 267 ("Where an expert otherwise reliably utilizes . . . methods to reach a conclusion, lack of textual support may go to the weight, not the admissibility[,] of the expert's testimony."); *Quiles v. Bradford-White Corp.*, 10-CV-0747, 2012 WL 1355262, at *3 (N.D.N.Y. Apr. 18, 2012) (McAvoy, J.) ("'[G]aps or inconsistencies' in an expert's reasoning, or arguments that an expert's conclusions are wrong, 'go to the weight of the evidence, not to its admissibility'") (quoting *Campbell v. Metro. Prop. and Cas. Ins. Co.*, 239 F.3d 179, 186 [2d Cir. 2001]); *CIT Group/Bus. Credit, Inc. v. Graco Fishing and Rental Tools, Inc.*, 815 F. Supp.2d 673, 676 (S.D.N.Y. 2011) ("Questions about the . . . sufficiency of the evidence of the evidence upon which the expert relied. . . are for cross-examination."); *see also MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*, 09-CV-3255, 2012 WL 2568972, at *15 (S.D.N.Y. July 3, 2012) ("Indeed,

most objections to expert testimony are related only to the weight of the evidence, not its admissibility.").

Fourth, and finally, the Court finds no reason to hold a *Daubert* hearing in this case because there is a well developed record from which the Court is able to evaluate the bases for Sheldon's testimony. Indeed, the record includes, inter alia, Sheldon's report and a 259-page deposition transcript exploring Sheldon's findings, with attached exhibits. (Dkt. No. 20, Attach. 6; Dkt. No. 20, Attach.7; Dkt. No. 20, Attach. 8.) The Court notes that, of course, the decision of whether or not to hold a *Daubert* hearing rests within the sound discretion of a district court. *Colon ex rel. Molina v. BIC USA, Inc.*, 199 F. Supp.2d 53, 70-71 (S.D.N.Y. 2001) (citing authority).

For all of these reasons, the Court denies Plaintiff's motion to preclude Sheldon's testimony, or, in the alternative, to hold a *Daubert* hearing.

**ACCORDINGLY,** it is

**ORDERED** that Plaintiff's motion to preclude the opinions of Defendant's expert, or, in the alternative, to hold a *Daubert* hearing (Dkt. No. 20) is **<u>DENIED</u>**; and it is further

**ORDERED** that Defendant's cross-motion to strike the Statement of Undisputed Material Facts that Plaintiff submitted with its motion (Dkt. No. 53 at 6) is **<u>DENIED</u>** as moot.

Dated: September 20, 2012
　　　　Syracuse, New York

_____
Hon. Glenn T. Suddaby
U.S. District Judge